UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| vs. | § | 5:23-CR-00575 |
| | § | |
| **HOMERO TOVAR** | § | |
| **Defendant** | § | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO DISMISS THE INDICTMENT**

The United States of America respectfully requests this Court to deny Defendant Homero Tovar's (Tovar) Motion to Dismiss the Indictment based on *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022).

Tovar's challenge should be rejected. First, the challenged statutes, 18 U.S.C. 922(o) and 26 USC 5861(d), are facially consistent with the Second Amendment under Bruen.[1] Supreme Court precedent does not cast doubt on laws imposing conditions and qualifications on the commercial sale of firearms. Even if the statute did regulate protected conduct, the statute would still be constitutional because it is consistent with the nation's historical tradition of firearms regulation. Therefore, Tovar's motion should be denied.

**Factual Summary**

On April 18, 2023, the Laredo Police Department were called to a location in Laredo, Texas, regarding a fight. Police arrived on scene to find Tovar involved in a fight. Witnesses identified Tovar as having pointed a gun at them. The witnesses directed law enforcement to

---

[1] This Court has stayed the motion with regards to the felon in possession offense, 18 U.S.C. 922(g)(1). See Dkt. 34.

Tovar's vehicle as the location of the firearm. During a consensual search of Tovar' vehicle, law enforcement located a Glock model 22, .40 caliber pistol with a loaded high-capacity magazine. Law enforcement noted the Glock had what appeared to be a Glock switch attached to the rear of the slide. They arrested Tovar.

After waiving his *Miranda* rights, Tovar admitted ownership of the Glock. Alcohol Tobacco and Firearms ("ATF") was able to confirm the attachment was in fact a Glock switch which is used to convert a semi-automatic firearm into a fully automatic firearm that allows the firing of multiple rounds of ammunition without reloading, by a single function of the trigger, therefore, a machinegun. Additionally, law enforcement found Tovar has a prior conviction for Robbery, a second-degree felony and was sentenced to two years in prison. ATF agents determined Tovar had not obtained the National Firearms Act ("NFA") approval to possess the firearm. A grand jury charged Tovar with violating 18 U.S.C. 922(g)(1) (felon in possession of a firearm), 18 U.S.C. 922(o) (illegal possession of a machinegun), and 26 U.S.C. 5861(d) (possession of an unregistered machinegun).

## I.     Legal Standard

The Second Amendment to the Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. However, "[l]ike most rights, the right secured by the Second Amendment is not unlimited; it does not allow every person "to keep and carry any weapons whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller,* 554 U.S. 570, 626 (2008). In evaluating what limitations Congress can impose on citizens' Second Amendment rights, the Supreme Court has directed courts to ask two questions: (1) whether "the Second Amendment's plain text covers an individual's conduct," *New York State*

*Rifle & Pistol Ass'n. Inc. v. Bruen,* 142 S. Ct. 2111, 2129–30 (2022), and (2) if not, whether "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*.

### A. Section 922(o)'s Prohibition on the Possession of Machineguns is Constitutional.

Section 922(o), which was enacted in 1986, bans the transfer or possession of a machinegun. 18 U.S.C. 922(o). It carves out an exception for (1) the transfer to, or possession by, a person acting under authority of the United States, or (2) any lawful transfer or possession of a machinegun that was lawfully possessed before the statute's enactment. 18 U.S.C. 922(o).

Defendant attempts to mount a facial challenge to this statute, arguing that the law—in all its applications—violates the Second Amendment. Dkt. No. 32. This challenge fails, though, because the Supreme Court has made clear that the Second Amendment's plain text does not cover machineguns.

In *United States v. Miller*, 307 U.S. 174, 178 (1939), the Supreme Court upheld against a Second Amendment challenge to two men's federal indictment for transporting an unregistered short-barreled shotgun in interstate commerce, in violation of the National Firearms Act, 48 Stat. 1236. Nearly 70 years later, in *Heller*, the Supreme Court affirmed *Miller*, explaining that *Miller's* "basis for saying that the Second Amendment did not apply was . . . that the *type of weapon at issue* was not eligible for Second Amendment protection." 554 U.S. at 622 (emphasis in original). *Heller* concluded: "We . . . read *Miller* to say only that the Second Amendment does not protect those weapons *not typically possessed by law-abiding citizens for lawful purposes*, such as short-barreled shotguns." *Id*. at 625 (emphasis added). It continued: "That accords with the historical understanding of the scope of the right." *Id. Heller* returned to *Miller* at its conclusion of the opinion. It wrote:

> *Miller* said, as we have explained, that the sorts of weapons protected were those "*in common use at the time.*" We think that limitation is fairly supported by the

historical tradition of prohibiting the carrying of "dangerous and unusual weapons."

554 U.S. at 627 (citing *Miller*, 307 U.S. at 179).

In other words, under *Heller*, the Second Amendment does not protect those weapons that were "not in common use at the time" of its passage and that were not "typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625, 627. The defense points to no data to indicate that such weapons were used by private citizens when the Bill of Rights was enacted. Under *Miller* and *Heller*, therefore, he has not demonstrated how the plain text of the Second Amendment covers his possession of machineguns as firearms "in common use at the time" by private citizens.

Nothing in *Bruen* disturbed *Miller* or *Heller*. Instead, both concurrences in *Bruen* emphasized the narrow scope of its holding. Justice Alito, concurring, wrote that "our holding decides nothing about who may lawfully possess a firearm. Nor have we disturbed anything that we said in *Heller* or [*McDonald v. City of Chicago, Ill.,* 561 U.S. 742 (2010)] about restrictions that may be imposed on the possession or carrying of guns." 142 S. Ct. at 2157. Justice Kavanaugh, joined by Chief Justice Roberts in a separate concurring opinion, noted that as the Supreme Court had previously explained in *Heller* and *McDonald*, "the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check" and that "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id.* at 2162 (cleaned up).

Multiple courts have relied on *Heller* to conclude that machineguns fall outside the Second Amendment's scope. *See*, *e.g., United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d 136, 141-44 (3rd Cir. 2016) (Finding "the Second Amendment does not protect the possession of machine guns. They are not in common use for lawful purposes."); *Hollis v. Lynch*, 827 F.3d 436, 449- 51 (5th Cir. 2016) (finding that

machineguns do not receive Second Amendment protection because they are dangerous and unusual); *Hamblen v. United States*, 591 F.3d 471, 473-74 (6th Cir. 2009) (finding the right to keep and bear arms does not authorize an unlicensed individual to possess unregistered machineguns for personal use); *United States v. Fincher*, 538 F.3d 868, 873-74 (8th Cir. 2008) (finding machineguns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use); *United States v. Henry*, 688 F.3d 637, 639-40 (9th Cir. 2012) (finding that short of bombs, missiles, and biochemical agents, few weapons are more dangerous than machineguns and thus the Second Amendment does not apply).

Hollis sought permission from the ATF to build a M-16, the modern machinegun, which was denied. *Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016). Hollis sued, arguing he had a Second Amendment right to possess one. *Id*. In *Hollis*, the Court relied on *Heller*, stating there are two classes of weapons: (1) those that are useful in the militia or military; and (2) those that are "possessed at home" and are in "common use at the time for lawful purposes like self-defense. *Id*. The *Hollis* Court went on to say that, if a weapon is dangerous or unusual, it is not in common use and therefore not protected by the Second Amendment. *Id*. at 446. The *Hollis* Court held that machineguns are dangerous weapons as the possession constitutes conduct that presents a serious risk of physical injury to another due to the inherently dangerous nature of machineguns. *Id*. at 448.

In short, in light of binding Supreme Court precedent holding that the Second Amendment protects only those weapons "in common use" by private citizens at the time of its enactment—and the persuasive authority afforded by numerous federal appeals courts extending that conclusion expressly to machineguns—this Court should deny Tovar's motion to dismiss his illegal possession of a machinegun.

**B. Prohibiting the Possession of Machineguns is Consistent with the Nation's Historical Tradition of Firearm Regulation**

Even if this Court were to conclude that the Second Amendment's plain text protects the possession of machineguns, Section 922(o) still does not violate the Second Amendment because the statute "is consistent with this Nation's historical tradition of firearm regulation." *Bruen,* 142 S. Ct. at 2129–30.

To assess "whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding," *Bruen* contemplated two avenues of inquiry: (1) a "straightforward historical inquiry" to search for, most relevant here, historical regulations similar to the modern-day regulatory counterpart at issue or evidence that a comparable historical regulation was rejected on constitutional grounds; or (2) a "historical analogy," for instances where there is no such straightforward correspondence between the challenged law and predecessors. *Id.* at 2131-34.

For purposes of defendant's challenge to Section 922(o), the "straightforward historical inquiry" that *Bruen* described suffices. *Heller* explained—and *Bruen* did not disturb—that this nation's "historical tradition" includes "prohibiting the carrying of dangerous and unusual weapons." 554 U.S. at 637.[2] For example, under English common law, "the offense of riding or going armed, with dangerous or usual weapons, [was] a crime." 4 W. Blackstone, Commentaries

---

[2] In support of this conclusion, *Heller* cited *Miller*, 307 U.S. at 179; 4 W. Blackstone, Commentaries on the Laws of England 148–49 (1769); B. Wilson, Works of the Honourable James Wilson 79 (1804); J. Dunlap, The New–York Justice 8 (1815); C. Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822); 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271–272 (1831); H. Stephen, Summary of the Criminal Law 48 (1840); E. Lewis, An Abridgment of the Criminal Law of the United States 64 (1847); F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852). *See also State v. Langford*, 10 N.C. 381, 383– 384 (1824) (defendants who entered home with firearms and shot a dog was a breach of peace and not merely civil trespass); *O'Neill v. State*, 16 Ala. 65, 67 (1849) (quarrelsome words in a public place alone does not constitute an offense, but quarrelsome words while armed is); *English v. State*, 35 Tex. 473, 476 (1871) (prohibition of carrying pistols, dirks and certain other deadly weapons does not violate the Second Amendment); *State v. Lanier*, 71 N.C. 288, 289 (1874) (going armed with dangerous or unusual weapons is a crime against the public peace).

on the Laws of England 148–49 (1769). In the United States, too, courts long ago acknowledged that a man commits "an offence at common law" when he "arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." *State v. Langford*, 3 Hawks 381, 383 (NC 1824). For that reason, the Second Amendment encompasses only arms "of the kind in common use." *Heller*, 554 U.S. at 624 (quoting *Miller*, 307 U.S. at 179).

That the common-use limitation is consistent with the Second Amendment's prefatory clause: "The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Heller*, 554 U.S. at 624. *Heller* recognized that "[i]t may be objected that if weapons that are most useful in [modern] military service—M-16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause" that refers to militias. *Id.* at 627-28. But *Heller* explained that "the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right." *Id.* at 628.

*Bruen* did not change this aspect of *Heller*. Instead, *Bruen* reaffirmed *Heller's* finding there is a "fairly supported" "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Bruen*, 142 S. Ct. at 2128 (citing 4 W. Blackstone, Commentaries on the Laws of England at 148-149: *Miller*, 307 U.S. at 179). *See also supra* at 6 (describing how the concurring opinions in *Bruen* continued to recognize important limitations on the right to bear arms).

Considering *Heller*'s conclusion that our nation's historical tradition includes regulating dangerous and unusual firearms—a conclusion rooted in a variety of historical resources wholly unrefuted by Tovar—this Court should reject Tovar's constitutional challenge to Section 922(o) on historical grounds, assuming it does not already conclude that the plain text of the Second

Amendment does not cover the possession of machineguns.

## C. Firearm Regulation Falls Within the Historical Tradition of Regulating Commerce in Firearms.

The National Firearms Act (NFA) is a comprehensive taxing scheme that regulates the manufacture, sale, and transfer of certain especially dangerous and concealable weapons. Under the NFA, the word "firearm" is defined to include only those weapons listed in 26 U.S.C. 5845(a), one of which is a machinegun. A machinegun is defined as any weapon which shoots, is designed to shot, or can be readily restored to shoot, automatically more than one shot without manual reloading, by a single function of the trigger. 26 U.S.C. 5845(b). The Eleventh Circuit has determined that "[t]he National Firearms Act is facially constitutional," pursuant to Congress' taxing power *United States v. Spoerke*, 568 F.3d 1236, 1245-46 (11th Cir. 2009) ("Congress under the taxing power may reasonably impose a penalty on possession of unregistered weapons.") (quoting United *States v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972)); see also *United States v. Bolatete*, 977 F.3d 1022, 1030 (11th Cir. 2020). *See also United States v. Tagg*, 572 F.3d 1320, 1326 (11th Cir. 2009) (rejecting defendant's Second Amendment-based challenge to constitutionality of NFA and finding that "pipe bombs are not typically possessed by law-abiding citizens for lawful purposes" and therefore fall within "the historical tradition of prohibiting the carrying of dangerous and unusual weapons"); *supra at 6* (collecting cases holding that because machineguns are "dangerous and unusual," they fall outside the Second Amendment's scope). For purposes of the Second Amendment, machine guns are "dangerous or unusual weapons" under the reasoning in *Heller*, and their regulation via the NFA's registration and taxation requirements is analogous to historical laws regulating commerce in firearms. Even assuming that machineguns are within the meaning of the Second Amendment, the NFA's restrictions on machineguns are well in line with the historical tradition of regulating commerce in firearms.

The NFA's registration and taxation requirements fall into another national historical tradition: the regulation of commerce surrounding firearms. "[C]olonial governments substantially controlled the firearms trade." *Teixeira v. Cnty. Of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). For example, "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals." Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 76 (2017). "A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions.'" *Id*. In the early 17th century, Connecticut banned residents from selling firearms outside the colony. *Teixeira*, 873 F.3d at 685. Virginia provided that people were at liberty to sell arms and ammunition to any of his majesties loyal subjects inhabiting this colony." *Id*. at 685 n.18. And other colonial government "controlled the conditions of trade" in firearms. *Id*. at 85.

States continued to enact laws governing "the manufacture, sale [and] transport" of guns and ammunition in the 18th and 19th centuries. *Id*. at 74. For example, in 1814, "Massachusetts required that all musket and pistol barrels manufactured in the state be first tested," and it appointed a state inspector "to oversee or conduct the testing." *Id.* Likewise, in 1820, "New Hampshire created and appointed state gunpowder inspectors to examine every storage and manufacturing site." *Id*. Meanwhile, "[t]wentieth century laws extended safety regulations pertaining to gunpowder and other explosives." *Id.*

Like these early laws, the NFA's registration and taxation requirements for machineguns do not prohibit possessing or even transferring them. Instead, the statute at issue merely imposes record-keeping and attendant payment requirements to document the items[3] to help ensure that

---

[3] Under the NFA, a manufacturer, importer, or dealer of a covered firearm must register with ATF as a special occupational taxpayer (SOT) by first engaging in the business; pay an occupational excise tax; and register each firearm with ATF in the National Firearms Registration and Transfer Record (NFRTR). The "maker" of a covered firearm, which his defined to mean a person who manufactures, puts together, alters, or otherwise produces a firearm, must pay a making tax of $200 for each firearm

they can be traced (*e.g.*, when they are believed to have been used in a crime). Although the NFA may not be identical to the above-referenced historical statutes, *Bruen* explained that the government need only identify a "historical analogue, not a historical twin." 142 S. Ct. at 2133. In this case, the practice of the colonies and the United States of regulating commerce in firearms provides a sufficient historical analogue to the NFA.

Moreover, *Bruen* expressly did not disturb the "shall issue" licensing laws that exist in 43 states. 142 S. Ct. at 2138 n.9. And Justice Kavanaugh's concurrence emphasized that state can constitutionally require license applicants to "undergo fingerprinting, a background check, a mental health records check and training in firearms handling and in law regarding the use of force, among other possible requirements." *Id.* at 2162. A registration scheme for machineguns is no more burdensome than the kind of requirements that the Supreme Court already has found to be constitutionally unproblematic.

### D. Conclusion

For the reasons stated above, Tovar's motion to dismiss the possession of a machine gun and the unlawful possession of an unregistered machine gun of the indictment should be denied.

Respectfully submitted,<br>
ALAMDAR S. HAMDANI<br>
UNITED STATES ATTORNEY<br><br>
BY: /s/ Steven Chamberlin<br>
STEVEN CHAMBERLIN<br>
Assistant United States Attorney

---

made. No person may make a firearm unless an application is filed with ATF. The maker, or subsequent transferor, may thereafter transfer the weapon only pursuant to the NFA, which requires that the maker or transferor identify itself, the firearm, and the transferee, and apply for and receive approval from ATF. The makers or transferor must then pay a transfer tax of $200 for each firearm transferred. 26 U.S.C. § 5811.

CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2023, a true and correct copy of the foregoing instrument was electronically filed with the Clerk of the Court using the CM/ECF System which will transmit notification of such filing to all Counsel of Record.

_____
STEVEN CHAMBERLIN
Assistant United States Attorney